FILED
2014 Oct-30  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| KC WARREN ING | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: |
| | ) |
| SERRA NISSAN/OLDSMOBILE, Inc., a | ) |
| domestic corporation; | ) **PLAINTIFF DEMANDS** |
| CEDRIC ROBINSON, an individual; | ) **TRIAL BY STRUCK JURY** |
| MICHAEL J. WILKINSON, an individual; | ) |
| ABDUL ISLAM MUGHAL, an individual; | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

COMES NOW the Plaintiff, KC WARREN ING, by and through undersigned counsel, and in support of her claim for relief against Defendants SERRA NISSAN/OLDSMOBILE, INC., CEDRIC ROBINSON, MIKE WILKINSON, and ADBUL ISLAM MUGHAL, hereby states the following:

### I.  NATURE OF THE CASE

1.      This is an action for damages, arising under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Additionally,

the action includes claims of fraud, deceit, misrepresentation, negligence, negligent misrepresentation, and conspiracy to commit some or all of the aforementioned torts. All aforementioned acts constitute predatory lending and predatory sales practices and a predatory lending and sales scheme by Defendants.

2.      Defendants form an enterprise in a fraudulent scheme to sell and lease vehicles to residents of Birmingham, and in nearby towns, cities and nearby states, through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

**3.**      Defendants take advantage of the buyer's sometimes desperate financial position, as well as the buyer's unfamiliarity with credit financing practices, to impose very unfavorable lending terms and, ultimately, cause unsuspecting buyers to enter into contracts that they are financially incapable of upholding.

## II. JURISDICTION

4.      This Action is brought pursuant to the provisions of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, with resulting jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) in that Plaintiff and Defendants reside or do business in this district and/or a substantial part, if not all, of the events or omissions giving rise to the claim occurred in this district.  Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) in that all parties reside, are found, have an agent, and/or transact his/her/its affairs in this district.

## IV. PARTIES

6.      Plaintiff **KC WARREN ING** (hereinafter referred to as "Plaintiff" or "Ms. Ing") is an adult citizen and a resident of Jefferson County, Alabama.

7.      Defendant **Serra Nissan/Oldsmobile, Inc.** (hereinafter "Serra") is a for-profit company, formed and currently operating in Jefferson County, Alabama, in the business of selling cars to the public.  The principal place of business of Serra Nissan/Oldsmobile, Inc. is 1500 Center Point Road, Birmingham, AL 35215.  The registered agent for Serra Nissan/Oldsmobile, Inc. is Anthony F. Serra, with a registered office street address of 9709 Parkway East, Suite D, Birmingham, AL 35215.

8.      Defendant **Cedric P. Robinson**, is, through information and belief, a resident and citizen of Jefferson County, Alabama.  Defendant Cedric Robinson

was, at the time of the transactions made the subject of this complaint an employee and/or agent of the Serra Defendant.

9.     Defendant **Michael J. Wilkinson**, is, through information and belief, a resident and citizen of Jefferson County, Alabama.  Defendant Michael Wilkerson was, at the time of the transactions made the subject of this complaint, an employee and/or agent of the Serra Defendant.

10.     Defendant **Abdul Islam Mughal**, is, through information and belief, a resident and citizen of Jefferson County, Alabama.  Defendant Mughal was, through information and belief, the General Sales Manager of the Serra Defendants at the time of the transactions made the subject of this complaint.


# V. JURY DEMAND


11.    Plaintiff invokes her right to trial by jury as provided for in 42 U.S.C. § 1981a(c)(1) and Rule 38 of the Federal Rules of Civil Procedure.


# VI. STATEMENT OF FACTS


12.     Serra Nissan/Oldsmobile ("Serra") is located on Centerpoint Parkway in Birmingham, Alabama, and sell new and used cars through both cash sales and

vehicle financing.

13.     Serra, while an original creditor on the financed vehicle sales, typically does not remain the creditor, or "tote the note," but sells and assigns the customer finance contracts to third party banks, such as Capitol One, Santander, or Regions.

14.     As part of the sales process, Serra, using identifying, financial and employment information obtained from the customer, typically submits such information via telephone, wire, or internet, to the various third party banks using software dealer management systems, also known as "DMS", such as those provided by DealerTrack Technologies, Inc., and Route One, Inc.  The DMS allows the dealerships to electronically submit the aforementioned customer information to multiple third party banks and financial institutions, in an effort to find a buyer for the customer-financing contract.

15.     After the third party bank agrees to purchase and take assignment of the contract, the funds from the bank are transmitted by wire from the bank to Serra.  Generally, the dealership makes additional profit on the deal by having the customer sign a contract for a higher interest rate than the bank requires to approve its purchase of the financing contract.  This profit, along with the profit made on the sale is paid to the dealership and the various employees, including salesmen and managers, who may receive extra incentives for selling more vehicles, or

certain models of vehicles.

16.     Except for providing identification, financial, employment, and other information, the customer has no involvement in the financing process, and is not made aware of what information is submitted or the possible differences in what financing interest rate the bank will buy versus what Serra represents to the customer is the "best" they can do.

17.     On or about November 3, 2012, Ms. Ing went to Serra Nissan for the purpose of investigating new and used automobiles.

18.     Upon arriving at Serra, Ms. Ing met Cedric Robinson, a salesman for Serra Nissan.

19.     One of the first questions Cedric Robinson asked Ms. Ing was how much she could afford to pay for a car each month.  Ms. Ing informed Serra's sales personnel that she had a monthly income of approximately $ 2700.00, and could only afford a monthly payment of approximately $300.00 to $350.00.    Without informing Ms. Ing, Serra's salesman Cedric Robinson, and or other agents of Serra Nissan, marked her credit application as showing Ms. Ing had a monthly income of $4785.00.

20.     Ms. Ing had a 2009 Nissan Sentra vehicle that she was considering using as a trade in, and allowed Cedric Robinson to take the keys to the Sentra, so that Robinson, and other Serra employees, could assess its value. Ms. Ing

repeatedly stressed to Cedric Robinson that she needed a car she could afford, given her income.

21.       Ms. Ing waited at the Serra dealership for several hours while Cedric Robinson worked to "put her in a car".  After several hours, Ms. Ing told Cedric Robinson that she wanted her Nissan Sentra back, she did not want to buy a car, and that she wanted to leave.  Cedric Robinson did not return Ms. Ing's car to her. Instead, he told her she couldn't have the car back because Robinson and others had been working the Nissan Sentra into a "deal" as a trade in, and that Ms. Ing could not get financed without the Nissan Sentra as a trade-in.  Ms. Ing was then told she was approved to buy a 2013 Nissan Rogue, but only if she used the Nissan Sentra as a trade-in.

22.       By this time, Ms. Ing was exhausted from sitting at the dealership. She felt as though Robinson wouldn't return her Nissan Sentra, and wasn't sure how she would get home without it.

23.       Cedric Robinson took Ms. Ing to another Serra employee named Mike Wilkinson, explaining that Wilkinson handled the financial part of the sale. Wilkerson handed Ms. Ing a pen and instructed her to sign the contract in the places he indicated if she wanted the car.  Ms. Ing signed the contract in reliance on Cedric Robinson's and Mike Wilkinson's statements that she had been approved for financing for the purchase, and that the other terms were accurate.

24.     Cedric Robinson gave Ms. Ing a copy of portions of the sales contract after she signed it, and took another copy to another office in the dealership.

25.     Ms. Ing struggled to make payments to the finance company and had to have help to make payments. Later, Ms. Ing discovered that Cedric Robinson, Mike Wilkerson, and/or other unknown agents of Serra had falsified her income. Specifically, she learned that the credit application stated that she made $ 4,785.00 per month, had lived at her residence for 3 years and had been employed by the named employer for 7 years.   These representations were not true, and not what Ms. Ing had stated to Serra and its agents and employees.

26.     Through information and belief, on or about September of 2013, agents for the Federal Bureau of Investigation (hereinafter FBI) served a search warrant at the location of Serra Nissan in connection with the federal prosecution of the aforementioned Defendant, ABDUL ISLAM MUGHAL, for wire fraud in violation  of 18 U.S.C. 1343.

27.     On or about June 30, 2014, Abdul Islam Mughal entered into a plea agreement with the United States Attorney's Office as to Counts One and Two of the Information filed in United States District Court for the Northern District of Alabama, Southern Division, Case No.: 2:14-cr-00191.   Said Plea Agreement, setting forth Mr. Mughal's stipulations of fact as to said Counts, is attached hereto as "Exhibit A".  Plaintiff incorporates said Plea Agreement in its entirety into this

complaint.

## VII. CAUSES OF ACTION

## ALTERNATIVE PLEADINGS

Plaintiff alleges that the occurrences made the subject of this complaint require that Plaintiff pleads one or more of the following counts, or, in some cases, one or more of the individual claims thereof, in the alternative, where inconsistency arises in their application.

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C.§ 1961 et seq.

## - ALL DEFENDANTS

28.     Plaintiff incorporates by reference the preceding paragraphs and attachments of this Complaint, and alleges that all Defendants, including persons and entities unknown to Plaintiff at this time, conspired to, and engaged in, a predatory lending and sales scheme in an organized effort to sell and lease vehicles

to poor and working class residents of Birmingham and cities in nearby states through false and misleading advertising, and intentionally misleading acts and omissions in sales and service.

29.     Defendants, and others, falsified information and documents for the Plaintiff, and created false and misleading statements of the Plaintiff's income and financial abilities.

30.     Defendants, and others, falsely and fraudulently inflated the income and employment information of Plaintiff, and submitted same to financial institutions so the Plaintiff, who would not otherwise qualify for automobile financing, would show an artificially high income or other artificial attribute, and be able to obtain financing.

31.     Defendants, and others, directed finance managers and salesmen to submit fraudulent information to financial institutions to misrepresent the Plaintiff's income and ability to pay for vehicle financing.

32.     Defendants, and others, defrauded financial institutions by making it appear that the Plaintiff qualified for automobile financing, when in fact Plaintiff would not otherwise qualify.

33.     Defendants' ultimate scheme is intended to sell a vehicle, and reap financial benefits, regardless of the buyer's ability to make payments on the financing contract, or the assignee-banks ability to collect against the falsified

income.

34.    All Defendants used wire, radio, or television communication in interstate or foreign commerce, as well as writings, signs, signals pictures, or sounds in furtherance of their actions as set forth above, and all Defendants engaged in a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961-1968.

35.    Defendants, all of which are persons within the meaning of RICO, are employed by or associated with an enterprise whose activities engage in or affect interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.§ 1962(c); to wit, multiple violations of 18 U.S.C. §§ 1341, 1343, 1344.  See Exhibit "A", Plea Agreement of Abdul Islam Mughal.

36.    The members of the group have the same or similar purposes, results, participants, victims, methods of commission, and are interrelated by distinguishing characteristics and are not isolated events.

37.    All Defendants violated 18 U.S.C. § 1341 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of the United States Postal Service, for the purpose of executing such scheme or artifice.

38.     The multiple violations of 18 U.S.C. §1341 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

39.     All Defendants violated 18 U.S.C. § 1343 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice.

40.     The multiple violations of 18 U.S.C. §1343 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

41.     All Defendants violated 18 U.S.C. § 1344 multiple times, having devised or intended to devise a scheme or artifice to defraud a financial institution, or for obtaining money or property from a financial institution, by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by Defendants, and others, for the purpose of executing such scheme or artifice.

42.     The multiple violations of 18 U.S.C. §1344 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending and Sales Scheme.

43.     All Defendants knew the Predatory Lending and Sales Scheme could not have succeeded and/or continued without the use of extensive advertisements through wire, internet, radio, television, and pictures in interstate or foreign commerce for the purpose of transmitting misleading and fraudulent information to prospective customers such as Plaintiff.

44.     The facts demonstrate that Defendants formed an association-in-fact.

45.     The associated persons formed an ongoing organization, formal or informal, concerning the RICO Enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO Enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the existence of an association-in-fact RICO Enterprise by showing that the enterprise has a certain amount of organizational structure or some sort of chain of command.

46.     Defendants Cedric Robinson, Mike Wilkerson, Abdul Islam Mughal, and others, acting as agents for Serra, are at the heart of the RICO Enterprise. Their role as facilitators is crucial to the success of the enterprise. The scheme begins with television, radio and internet advertising for Serra that is targeted at

unsophisticated, poor, uneducated, mentally ill, and working class residents of the Birmingham and surrounding areas, including Tennessee, Georgia and Mississippi.

47.     When the customers arrive at Serra, they are greeted by a salesperson. The first thing that the salesman asks the customer is either how much of a monthly payment the customer can afford, or how much of a down payment he or she can make that day. The salesman then brings the customer further back in the lot to a vast selection of cars.

48.     Sometimes a customer picks out a car, and sometimes the salesman will tell the customer what he or she can afford to pay for, based on the customer's income. The salesman may then tell the customer that he or she must make a down payment in a certain amount. Whether or not the customer and salesman agree on a down payment, the salesperson will direct the customer to an office within the dealership where the customer waits while the salesman works to obtain what the dealership refers to as "financing" for the customer.

49.     Because Serra does not typically hold the credit contract for the vehicles it finances as part of the sale, Serra depends on third-party banks to buy the financing contract.  These banks will only buy the contract if the debtor, such as Plaintiff herein, meets the bank's criteria for such credit, which is based, in no small part, on the debtor's ability to make all of the payments under the credit contract.

50.     If the customer would not otherwise qualify for financing, the RICO Enterprise would fraudulently inflate the customer's income information so customers would show an artificially high income and would qualify for financing.

51.     If the third-party banks/financial institutions required proof of income, residency or other proof of the ability to pay the financing contract, the RICO Enterprise would create false documents, or alter existing documents, and submit such documents to the financial institutions.   Such information caused wire, telephone and electronic communications to the made across state lines.

52.     Within the RICO Enterprise, there was a scheme, known by Defendants herein, and others, that if a customer did not qualify for financing, the RICO Enterprise would falsify information or documents that would ensure the customer was funded.

53.     Once the dealership finds a bank that will purchase a proposed credit contract/lease sale under terms that are sufficient for the RICO enterprise to make a substantial profit, the salesman will then often hand over the customer to a person to sign the paperwork or complete the finance and/or lease of the vehicle.

54.     The finance person often quotes a payment for the car that is different, and higher, than the amount the customer believed he or she had negotiated with the salesman. The finance person will then use one of several techniques to distract the customer as they sign a stack of pre-filled out sales related contracts, so the

customer overlooks the high interest rate, actual down payment, total price, and the Truth in Lending boxes in general. The finance person will instead draw the customer's attention to the due date for the payments, discuss features of the new car, or otherwise distract the customer, without fully explaining the actual payments due under the contract or its terms, if any explanation is given at all.

55.     After the customer signs the paperwork, and the third-party bank has purchased and been assigned the financing/lease contract, the RICO Enterprise of the Serra Defendants, Mr. Robinson, Mr. Wilkerson, Adbul Islam Mughal, as well as other agents of Serra, have already made a substantial profit on the vehicle sold or leased to the customer.  Whether or not the customer makes all of their payments to the third party bank under the terms of the sale/lease contract is of no concern to the Defendants, because the RICO Enterprise has moved another car off its lot and received payment for the commercial paper from the third-party bank.

56.     The RICO Enterprise exists by use of advertising to lure customer into the dealership.  Once the customer is in the door, the RICO Enterprise fraudulently alters and/or misrepresents the customer's financial ability, including their income, for the purposes of inducing third party banks to take assignment of credit financing sale/lease contracts with the customer.  Not only are the banks tricked into taking assignment of a contract that the RICO Enterprise knows will likely be defaulted on, but the customer themselves are tricked into believing that they are

16

financially able to make payments under the financing contract. Furthermore, the customer is led to believe that the bank has investigated the income and credit history on the customer's behalf and that "qualification for credit" means the customer has the financial means to pay.

57.     By reason of the aforesaid violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), Defendants are liable to Plaintiff for actual and treble damages, as well as for costs and attorney's fees.


**COUNT TWO:**

**WILLFULNESS, WANTONESS, NEGLIGENCE and/or RECKLESSNESS**

**- ALL DEFENDANTS -**

58.     Plaintiff hereby incorporates and adopts each of the above and foregoing allegations, exhibits, and material averments as if fully set forth herein.

59.     Defendants owed Plaintiff a duty not to be wanton, negligent and/or reckless in its/his/her conduct toward Plaintiff, including, but not limited to, the following conduct:

     a.  Violations of Ala.Code § 13A-9-11;
     b.  Violations of Ala.Code § 13A-9-49;

    c. Making material misrepresentations to third parties regarding Plaintiff's financial abilities, knowing that Plaintiff would be harmed by the third parties' reliance on such misrepresentations.

    d. Obtaining Plaintiff's consumer credit report based on false representations to third party banks and for the purpose of fraud;

    e. Other conduct inconsistent with Defendant's obligations and duties under the contract, federal and state law.

60.    Defendants were willful, wanton, negligent and/or reckless in its use of Plaintiff's personal information, including intentionally and knowingly false, misleading and deceptive information regarding the Plaintiff, to facilitate the sale of a vehicle to Plaintiff, to facilitate the sale of the Plaintiff's financing contract to third party banks and to maximize its own profit.

61.    Defendants were willful, wanton, negligent and/or reckless in its conduct as to the Plaintiff in that Defendant caused Plaintiff's consumer credit report to contain inquiries and information that damaged Plaintiff.

62.    By its conduct, the Defendants breached said duties to the Plaintiff and was wanton and/or negligent.

63.    As a proximate result, the Plaintiff were caused to suffer loss of monies, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT THREE:

## NEGLIGENT TRAINING, SUPERVISION AND RETENTION

## - ALL DEFENDANTS -

64.     Plaintiff repeats each and every allegation and exhibit contained in the paragraphs above and below and incorporates such allegations by reference.

65.     Defendants owed Plaintiff a duty of care and professionalism in the rendition of the services rendered and products sold to plaintiff and third parties, in training and supervising its employees to perform those services in full compliance with the laws of the State of Alabama and the Federal Government, in not engaging or allowing its agents to engage in the wrongful practices herein alleged, in not suppressing or concealing such activities, or enabling its agents to do so, and in not terminating or otherwise disciplining those employees or agents known to have violated company policies, state and federal laws or regulations by engaging in the misconduct herein alleged.

66.     Defendants owed duties to Plaintiff in putting forth loyal, honest, and fair dealing employees or agents who act in compliance with Federal and State laws regarding the sale, titling and financing of vehicles, as well as the proper methods utilized for credit inquiry and Defendants' superior knowledge of those respective industries, its practices, and Defendants' practices.   Defendants'

negligent retention of employees known to have engaged in the misconduct described herein acted as ratification of such misconduct. The Defendants each, and working collectively, or as agents, breached the duties they owed to Plaintiff, and such breaches arise out of the negligent or wanton conduct of the Defendants and those who acted in concert or conspiracy with them or acted as their agents, servants or employees, and in the line and scope of their business and contractual and statutory and regulatory duties, in order to preserve and protect the financial interest of the Defendants and those who acted in concert or conspiracy with them.

67.     Defendants knew, or should have known, of the wrongful or fraudulent practices engaged in by its employees or agents, and knew or should have known that its own training, supervision and retention practices were inadequate to fulfill its obligation to protect the public and the Plaintiff. Defendants knew, or should have known, that its policies and practices in training, supervising, and retaining such employees were inadequate to prevent or detect the misconduct described herein, and such inadequate policies and practices were the actual and proximate cause of Plaintiff's injuries.

68.     Plaintiff has incurred damages proximately caused by Defendants' negligence in training, supervising, and retaining its employees and/or agents.

69.     By its conduct the Defendants breached said duties to Plaintiff and were wanton, negligent and/or reckless.

70.     As a proximate result of the aforementioned conduct of Defendants, Plaintiff was caused to suffer loss of monies, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT FOUR:

## FRAUD, DECEIT, SUPPRESSION AND MISREPRESENTATION

## - ALL DEFENDANTS -

71.    Plaintiff hereby incorporates and adopts each of the above and foregoing allegations as if fully set forth herein.

72.    On or about November 3, and November 5, 2012, Defendants made one or more of the following misrepresentations to third party banks and financing institutions, for the purpose of illegally obtaining an agreement to provide financing:

      a.  Plaintiffs had presently agreed to be primary obligor on an automobile financing contract;

      b.  Plaintiffs had presently agreed to be a co-obligor on an automobile financing contract;

      c.  Plaintiffs were presently involved in a credit transaction with Serra;

      d.  Plaintiffs had presently provided authorization for Serra to obtain Plaintiffs' credit report using false information and financial disclosures;

e. Plaintiff had provided the employment and financial information stated on credit applications to Defendants;

f. Plaintiff had been approved for vehicle financing based on her actual income;

g. Defendants were using Plaintiff's actual indentifying, financial and employment information to obtain vehicle financing for Plaintiffs.

73. On or about November 03, 2012, the Defendants made the following misrepresentations of material facts to the Plaintiff upon which she reasonably relied:

a. That the Plaintiff qualified for credit financing with Alabama Telco Credit Union with her current credit history and current income per month.

b. That the Plaintiff was "approved" for credit.

c. That defendant would accurately and truthfully transmit the plaintiff's responses and answers in the credit application to third party lenders.

d. That this type of transaction was perfectly legal in all aspects and above board.

74. Defendants made such representations in order to increase its profit on the sale its vehicles and increase its/his/hers financial gain.

22

75.     Defendants made such representations in order to increase its profit on the sale of the trade-in vehicle.

76.     Based on such representation by Defendants, third party banks made inquiries with one or more Credit Reporting Agencies, thereby causing such inquiries to become part of Plaintiff's credit history.

77.     The aforementioned representations by Defendants were false.     The Defendants either (1) knew such representations were false and intentionally made them; or (2) recklessly made said representations without knowledge of truth or falsity; or (3) innocently or negligently misrepresented said facts causing Plaintiffs and others to reasonably rely upon them.

78.     On or about November 03, 2012, Defendants had a duty to correctly and accurately disclose to the Plaintiff and to any third party lenders, banks or finance companies, the plaintiff's actual financial condition.  Defendants had a further duty to accurately communicate Plaintiff's responses to their credit questions and Plaintiffs qualification for credit financing.   By their conduct, the Defendants hid and suppressed the actual financial terms the Plaintiff was entering into.  Under the Defendant's pervasive scheme it was the Defendants' pattern and practice that if a customer did not qualify for a car loan for some reasons, the Defendants and their salesmen, finance managers, sales managers or general sales managers would falsify information or documents that would ensure that credit agreement would be

purchased by a third party bank or lender.  In the case of the Plaintiff, Defendant's suppressed that they had:

    a.  Fraudulently inflated plaintiff's income on the credit application.

    b.  Had created false documents or altered existing documents submitted to financial institutions to ensure the purchase of the commercial paper.

    c.  Because of the Plaintiff's actual credit score and income that the Plaintiff would not qualify for financing with Alabama Telco Credit Union.

    d.  That Plaintiff had actually been denied credit under her actual income and credit score.

    e.  That said activity was illegal, immoral and unethical.

79.    As a proximate result of said conduct, the Plaintiff was caused to suffer loss of monies, loss of credit standing, incidental and consequential damages, severe mental anguish and emotional distress as well as additional costs of this proceeding and attorney fees.

## COUNT FIVE:

## CONSPIRACY - ALL DEFENDANTS -

80.     Plaintiff re-alleges the allegations set forth in the foregoing paragraphs and attached exhibits as if the same were set forth herein verbatim.

81.     The following persons and parties participated in a civil conspiracy to commit fraud by commission and by omission, the purposes of which are detailed below:

> Serra Nissan/Oldsmobile, Inc.,
>
> Cedric Robinson,
>
> Mike Wilkinson,
>
> Abdul Islam Mughal
>
> Other unknown co-conspirators.

82.     The civil conspiracy existed at all times material to this lawsuit, and continues to exist at the present time. The primary goal of the conspiracy was to profit through the sale of vehicles to consumers with low-income or poor credit by misrepresenting the consumer's income and finances to third party banks who would, in reliance on the misrepresentation, extend credit to the consumer.

83.     More specifically, the purposes of the conspiracy were:

> a. To purposefully create an illusion in the consumer that the consumer was financially capable of meeting the terms of a credit financing contract;
>
> b. To knowingly and intentionally lie to, deceive and improperly influence third party banks to extend financing to the consumer by

misrepresenting the consumer's income and financial capabilities to the third

party bank;

c. To enter into as the original creditor, contracts with the consumer for

the financing of vehicles;

d. To sell and/or assign said financing contracts to third party banks with

the knowledge that the consumer could not conform to the terms of the

contract, and would ultimately default, thereby causing the consumer to,

inter alia, have the vehicle repossessed, incur damage to their credit, and be

subject to collection efforts by the third party bank assignee.

e. To profit from the aforedescribed scheme through the sale of vehicles,

sales based incentives from manufactures and third party banks, and other

means.

84.     The conspirators agreed to carry out the purpose of the conspiracy

listed above, and as set forth in the factual allegation stipulated to by Mr. Mughal

in Exhibit "A", pages 2-6, attached hereto. The conspirators participated in and

cooperated with each other in the conspiracy. Each act of the conspiracy was

ratified by other co-conspirators, who acted as each other's agents, and still

continue to do so.

85.     Over the past years the conspirators, acting in concert, performed

numerous overt acts to further the purposes of the conspiracy.  Because many of

these acts were concealed, plaintiff is not able to state all overt acts, but alleges the following as an example:

Abdul Islam Mughal, former General Sales Manager at Serra Nissan/Oldsmobile, Inc., one of the co-conspirators named herein, was indicted in the United States District Court for the Northern District of Alabama, for conspiracy to commit wire fraud in violation of Title 18, United States Code, § 1343. *See* Exhibit "A"; United States District Court Northern District of Alabama Case Nos.: 2:13-cr-00411 and 2:14-cr-00191. In furtherance of the conspiracy, Mr. Mughal, and others:

a) falsified information and documents for customers, such as Plaintiff herein that did not qualify for vehicle financing to ensure the vehicle financing was funded;

b) falsified and fraudulently inflated the income information of prospective car purchasers submitted to financial institutions so customers, such as Plaintiff herein, that would otherwise not qualify for vehicle financing, would show an artificially high income and would be able to obtain vehicle financing;

c) created false documents or materially altered existing documents to be submitted to financial institutions to show that customers were making more than their actual income;

d) would profit financially through increased sales and additional commissions.

86.     As a result of the conspiracy alleged above, plaintiff was deceived by the conspiracy into believing they had good credit and could afford to make payments for vehicles sold and financed by the conspiracy.  The Plaintiff was lured into executing contracts with the co-conspirators which were based upon financing approvals by third parties who had been provided false and deceptive information by the co-conspirators.

87.     As a proximate result of the conspiracy, Plaintiff was injured and damaged.

**WHEREFORE**, Plaintiff respectfully prays that this Court:

1.     Assume Jurisdiction of this case;

2.     Empanel a jury to hear the issues in this case pursuant to Rule 38 of the Federal Rules of Civil Procedure and 42 U.S.C.§ 1981a (c)(1);

3.     Award to Plaintiff actual and treble damages to be established at trial pursuant to Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c);

4.     Award to Plaintiff costs and attorney fees pursuant to RICO, 18 U.S.C. § 1964(c);

5.      Award to Plaintiff actual, compensatory, and punitive damages to be established at trial for fraud;

6.      Award to Plaintiff actual and compensatory damages to be established at trial for negligent misrepresentation;

7.      Award to Plaintiff, damages, including punitive damages, to be established at trial for civil conspiracy;

8.      For a judgment against Defendants for compensatory damages in an amount to be proven at trial;

9.      Award to Plaintiff such other relief to which Plaintiff is entitled and that is deemed appropriate by the Court.


**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**


Respectfully Submitted on this, the 30th day of October, 2014.


*/s/ Thomas C. Donald*
Thomas C. Donald
ASB-6795-A47D, DON041
Law Office of Thomas C. Donald, LLC
1707 29th Court South
Birmingham, AL 35209
Phone: 205 985 2309
Fax: 205 802 7083
Email: cdonald@donaldlawfirm.com

*/s/ Michael E. Parrish*

Michael E. Parrish
ASB-5747-S69M, PAR075
PARRISH & THEUS, LLC
1707 29th Court South
P.O. Box 590067
Birmingham, AL 35259-0067
Phone: 205 326 0026
Email: mike.parrish@parrish-theus.com

PLEASE SERVE THE DEFENDANTS AT THE FOLLOWING ADDRESS:

**Serra Nissan/Oldsmobile, Inc.**
c/o/ Anthony F. Serra
9709 Parkway East
Suite D
Birmingham, AL 35215

**Cedric Robinson**
c/o/ Serra Nissan
1500 Center Point Road
Birmingham, AL 35215

**Michael J. Wilkerson**
c/o/ Donald Lee Colee
2229 Morris Avenue
Birmingham, AL 35203

**Abdul Islam Mughal**
6525 Service Road
Trussville, AL 35173